FILED
MISSOULA, MT

2006 AUG 29  PM 2 27

PATRICK E. DUFFY

BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, ALLIANCE) FOR THE WILD ROCKIES, and WILDWEST INSTITUTE. <br><br> Plaintiffs, <br><br> vs. <br><br> ABAGAIL KIMBELL, et al., <br><br> Defendants, <br> and <br><br> SITZ ANGUS RANCH, et al., <br><br> Intervenors, <br><br> and <br><br> MADISON COUNTY AND BEAVERHEAD COUNTY, <br><br> Intervening Defendants. | CV 04-127-M-DWM <br><br><br><br><br><br> ORDER |

## I.  Facts and History

The disagreement here involves grazing in southwest Montana. In this case, the disputed parcel is the 48,000 acre Antelope Basin-Elk Lake region in southwest Montana.  This area lies

-1-

within the bounds of the Beaverhead-Deerlodge National Forest
(BDNF) (467,000 acres), which in part, overlaps the southeast
portion of the Gravelly-Snowcrest Mountains in Beaverhead and
Madison Counties.

The project area has been divided into eleven grazing
allotments (ten cattle and one sheep).  The contested allotments
include 27,562 acres that are used for grazing.  This area has
been used for grazing for the better part of a century.

The 1995 settlement of *National Wildlife Federation et al.
v. Kulesza et al.*, CV-94-23-BU-PGH, prompted the United States
Forest Service (Forest Service) to amend the BDNF Land Resource
Management Plan (Forest Plan) (first implemented in 1986) to
provide for more stringent riparian policies in accordance with
the National Environmental Policy Act (NEPA).  In this regard,
the BDNF completed a Riparian Amendment in 1997.

In an effort to comply with 1995 settlement and the Riparian
Amendment, the Forest Service developed AntelopeBasin-Elk Lake
Allotment Management Plan Updates (AMPs).  The new AMPs were
designed to incorporate the Riparian Amendment into existing AMPs
to restore non-functioning riparian areas.

The Forest Service initiated the project in 2000 and
released the Environmental Assessment (EA) in February 2002 for
public comment.  Both the Ecology Center and the Native
Ecosystems Council, among others, provided comment.  The Forest
Service then issued a revised EA in December 2002 that
encompassed a more detailed analysis addressing arctic grayling

-2-

and sage grouse habitat and general Forest Plan compliance.

In July 2003, the Forest Service received a Biological Opinion from the United States Fish and Wildlife Service that concluded the project was not likely to adversely affect or jeopardize the continued existence of any listed species.

The Revised EA contained three alternatives for action: Alternative A, which was to continue with the status quo; Alternative B, the preferred alternative, which modified the AMPs to protect riparian habitat; and Alternative C, which banned grazing. Specifically, Alternative B revises the AMPs in numerous ways: the reduction of Animal Unit Months from 11,225 to 10,453; the elimination of the Elk Mountain allotment; a boundary change to create the Two Drink allotment; the exclusion of livestock from a portion of Elk Lake and all of Elk Springs Creek; the limitation of allowable upland forage utilization to 50%; the limitation of riparian forage to 55%; the potential to eliminate livestock from upper Narrows Creek; the inclusion of riparian thresholds for stream bank alteration, stubble height, and a shift to woody vegetation; and the allowance of new structural improvements as needed.

In November 2003 the District Ranger, Mark Petroni, made a decision to proceed with Alternative B and issued a Decision Notice and Finding of No Significant Impacts (DN/FONSI). The District Ranger concluded the election to update the AMPs and the selection of Alternative B was not a major federal action with significant effect on the quality of the human environment.

-3-

Accordingly, he determined that an EIS was not warranted.
Plaintiffs appealed the decision through the administrative
appeals process in January 2004. The Regional Forester, Abagail
Kimball, upheld the District Ranger's decision in February 2004.
Plaintiffs filed their Complaint in United States District Court
in June 2004.

## II. Procedural Background

Plaintiffs Native Ecosystems Council (Native Ecosystems),
Ecology Center, and Alliance for the Wild Rockies initiated this
action under NEPA, the National Forest Management Act (NFMA), and
the Administrative Procedure Act (APA) against Abagail Kimball,
Regional Forester, and the Forest Service, among others, seeking
declaratory and injunctive relief. The Complaint addresses the
Forest Service's November 2003 DN/FONSI approving Alternative B
and asserts four claims: 1) the decision violates NEPA and the
APA because it was made without requiring an EIS despite
significant adverse direct, indirect, and/or cumulative impacts
to other resources including wildlife, fisheries, and water
resources; 2) the Forest Service violated NEPA and the APA
because it did not take a hard look at the direct, indirect,
and/or cumulative impacts of its decision; 3) the decision
violates NFMA and the APA because it did not appropriately
preserve and enhance the diversity of plant and animal
communities within the affected area; and 4) the decision
violates NFMA and the APA because it is arbitrary, capricious,
and not in accordance with NFMA as it does not ensure the

-4-

viability of native wildlife, including but not limited to the Management Indicator Species (MIS), the sage grouse, which is also a sensitive species.

Native Ecosystems has six requests for relief: 1) a declaration that the decision regarding the AMPs is arbitrary, capricious, and an abuse of discretion requiring the decision be set aside pending compliance with the law; 2) the enjoinment of further implementation of grazing allotments in the Antelope Basin-Elk Lake area until the Forest Service demonstrates full compliance with the law; 3) a declaration that the BDNF is no longer in accordance with the law due to the failure to comply with its Forest Plan regarding the sage grouse (the MIS for sagebrush habitat); 4) a declaration that the BDNF is violating NFMA due to its failure to insure the viability of wildlife species, including but not limited to the sage grouse; 5) further and appropriate relief as the Court deems necessary to protect the BDNF; and 6) fees and costs consistent with the Equal Access to Justice Act.

Each party has filed for summary judgment. Native Ecosystems filed its motion seeking to enforce the points of its Complaint. Specifically, Native Ecosystems asserts the challenged decision is arbitrary and capricious due to the Forest Service's failure to prepare an EIS

The Forest Service's motion for summary judgment argues the DN/FONSI complies with NEPA, NFMA, and the Forest Plan. Intervenors incorporate the Forest Service's brief, challenge all

of Plaintiffs' claims, and make specific points alleging a
failure by Native Ecosystems to exhaust administrative remedies
under the APA.

For the reasons set forth below, the Forest Service is
entitled to summary judgment and the Plaintiffs are not.

## III. Analysis

### A. The Administrative Procedure Act Standard.

The Administrative Procedure Act, 5 U.S.C. § 701 *et seq*
(2000), provides the jurisdictional basis for this case because
NEPA and NFMA fail to provide a private right of action. Agency
decisions can only be set aside under the APA if they are
"arbitrary, capricious, an abuse of discretion, or otherwise not
in accordance with law." *Citizens to Preserve Overton Park, Inc.
v. Volpe*, 401 U.S. 402 (1971) (*quoting* 5 U.S.C. §706(2)(A))
(overruled on other grounds by *Califano v. Sanders*, 430 U.S. 99
(1977)).

Agency action can be set aside "if the agency has relied on
factors which Congress has not intended it to consider, entirely
failed to consider an important aspect of the problem, offered an
explanation for its decision that runs counter to the evidence
before the agency, or is so implausible that it could not be
ascribed to a difference in view or the product of agency
expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29 (1983); *Alvarado Community Hospital
v. Shalala*, 155 F.3d 1115, 1122 (9th Cir. 1998). The court must

-6-

ask "whether the [agency's] decision was based on a consideration
of the relevant factors and whether there has been a clear error
of judgment ... [The court] also must determine whether the
[agency] articulated a rational connection between the facts
found and the choice made.  [The] review must not rubber-stamp
... administrative decisions that [the court deems] inconsistent
with a statutory mandate or that frustrate the congressional
policy underlying a statute." *Ocean Advocates v. U.S. Army Corps
of Engineers*, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal
citations and quotations omitted).

**B.    The Summary Judgment Standard.**

Summary judgment is appropriate where there are no genuine
issues of material fact and the moving party is entitled to
judgment as a matter of law.  Fed. R. Civ. P. 56 (c) (2006); *see
also, Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
Summary judgment is particularly applicable to cases involving
judicial review of final agency action.  *Occidental Engineering
Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985) (citation omitted).
Summary judgment is appropriate in this case because the issues
presented address the legality of the Forest Service's actions
based on the Administrative Record and do not require resolution
of factual disputes.

**C.    The Selection of Alternative B Complies with the National
Forest Management Act.**

**1.    NFMA Standards**

The National Forest Management Act, 16 U.S.C. § 1604, is a

-7-

two-step process that sets forth management and substantive requirements for the oversight of America's national forests. *Native Ecosystems Council* v. *United States Forest Service*, 428 F.3d 1233, 1249 (9th Cir. 2005). This process entails planning and management at the forest level and at the project level. 16 U.S.C. § 1604; 36 C.F.R. Part 219 (2000); *Ohio Forestry Ass'n* v. *Sierra Club*, 523 U.S. 726, 729-30 (1998).

First, the Forest Service must produce a Land Resource Management Plan (forest plan). 16 U.S.C. § 1604(f)(1). The development of a forest plan takes place within a public review process conducted in accordance with NEPA. 16 U.S.C. § 1604(g)(1); 36 C.F.R. § 219.10(b). A forest plan establishes the planning goals and objectives for an individual forest and sets the specific standards and guidelines for the management of forest resources, ensuring consideration of both economic and environmental factors. 16 U.S.C. §§ 1604(g)(1)-(3); 36 C.F.R. §§ 219.1, 219.4(b)(3).

Once a forest plan is implemented, it can be updated through revision or amendment. 16 U.S.C. § 1604(f)(5); 36 C.F.R. § 219.10(g). A revision or amendment gives both the forest and the public the opportunity to review the plan's adequacy, through the EIS process if applicable, a 90-day public comment period, and other detailed procedures. 36 C.F.R. §§ 219.10(g) 219.12.

After the implementation of a forest plan, agency actions "must not only comply with NFMA but also be consistent with the governing forest plan." *Ecology Action Center, Inc.* v. *Austin*,

-8-

430 F.3d 1057, 1062 (9th Cir. 2005) (*citing* 16 U.S.C. § 1604(a)).
Proposed site-specific projects must (1) be consistent with the
forest plan and any amendments; (2) be analyzed as required by
NEPA; and (3) be approved by the responsible Forest Service
official. *Inland Empire Public Lands Council v. United States
Forest Service*, 88 F.3d 754, 757 (9th Cir. 1996).

The second aspect of NFMA is the substantive obligation
placed upon the Forest Service. This includes a duty to "provide
for diversity of plant and animal species." 16 U.S.C. §
1604(g)(3)(B). Pursuant to that statutory provision, the Forest
Service promulgated regulations at 36 C.F.R. Part 219. The
regulations provide:

> Fish and wildlife habitat shall be managed to maintain
> viable populations of existing native and desired non-
> native vertebrate species in the planning area. For
> planning purposes, a viable population shall be
> regarded as one which has the estimated numbers and
> distribution of reproductive individuals to insure its
> continued existence is well distributed in the planning
> area. In order to insure that viable populations will
> be maintained, habitat must be provided to support, at
> least, a minimum number of reproductive individuals and
> that habitat must be well distributed so that those
> individuals can interact with others in the planning
> area.

36 C.F.R. § 219.19.[1] To ensure population viability, the
regulations mandate the identification and selection of a MIS for
each national forest. 36 C.F.R. 219.19(a)(1).

Planning alternatives must be stated and evaluated in terms

---

[1]The obligation to maintain habitat viability, as set forth
in 36 C.F.R. § 219.19, is no longer imposed by the Code of
Federal Regulations. *See* 36 C.F.R. Part 219 (2005).

-9-

of both amount and quality of habitat and of MIS population trends. 36 C.F.R. § 219.12(a)(2). The regulations go on to provide that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.19(a)(6). In the Ninth Circuit, however, the monitoring requirement is interpreted to allow the Forest Service to rely upon the availability of suitable MIS habitat, rather than population surveys, to meet NFMA's viable population requirement. *Inland Empire*, 88 F.3d 754, 762-63. However, for this "proxy-on-proxy" approach to be legitimate, it must be based upon reliable habitat standards and measurement. *Native Ecosystems Council*, 428 F.3d at 1251.

Thus, the provisions of NFMA directly apply to the present question.

## 2. The Decision Complies with NFMA.

The Forest Service's decision complies with NFMA and in turn, the BDNF Forest Plan, because Alternative B provides for the viability of sagebrush habitat, riparian habitat, and their associated species. The AMP both satisfies the Forest Plan's mandate to maintain "viable populations of all existing wildlife species" by "providing diversity of habitat throughout the Forest" and abides by the NFMA obligation to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area."[2]

---

[2] Native Ecosystems partially bases its NFMA claim on an asserted failure by Defendants to "maximize long term net public

#### a.    Sage Grouse and Sagebrush Habitat

Reliable scientific analysis and habitat comparison bear out

the efficacy of the Forest Service's DN/FONSI and its compliance

with NFMA and the Forest Plan.

Native Ecosystems wrongly contends the Forest Service has

"extirpated" the sage grouse from the BDNF.  Native Ecosystems

further asserts that spraying, burning, and grazing have had

significant cumulative impacts on sagebrush habitat and its

obligates.  Plaintiffs cite decreasing population trends on

nearby leks, sage grouse breeding areas, and the general absence

of sage grouse within the area as evidence of the effects of

Forest Service management of the Antelope Basin-Elk Lake

allotment area.  These arguments form the foundation of Native

Ecosystem's challenge under NFMA.

Plaintiffs refer to experts Glenn Hockett and Dr. Sara Jane

---

benefits" pursuant to economic considerations, among others,
under 36 CFR § 219.1(a).  Plaintiffs contend that the proposed
action will cost the public money by failing to preserve the
natural environment.  This is certainly conceivable, indeed
probable, in certain locales.  Here, however, Native Ecosystems
presents no evidence in support of this assertion other than the
fact that cumulatively, Montana outdoors advocates spend $1
billion annually and an assertion of economic inefficiency.
Defendants counter the cattle and sheep ranching economy in
southwestern Montana is partially dependent on grazing access to
public lands such as those involved herein.  The Forest Service
met its obligation here and specifically examined the impact of
its decision upon the local economy.  It found under Alternative
C, the no grazing option, ranching viability would be an issue.
Plaintiffs do not rebut this.  Defendants also point out that
Plaintiffs have not demonstrated a link between the alleged
disappearance of plant and animal communities and economic loss.
Thus, this aspect of Native Ecosystems' NFMA argument is not well
taken and ignores Forest Service research.

Johnson (a representative of Native Ecosystems) to substantiate
their analysis.  Notably, they also cite Dr. Jack Connelly and
his work no less than seven times in their two briefs.  They
describe Connelly's work as the "best science currently
available" twice and defer to the Connelly's 2000 "Guidelines for
Management of Sage Grouse Populations and Habitats."

The Forest Service effectively counters Native Ecosystem's
assertions with undisputed facts, the application of Connelly's
2000 Guidelines, and Connelly's approval of the project
management plan.

Native Ecosystems ostensibly blames this relatively small
sliver of land management-initiated to address riparian habitat
concerns-in the BDNF for the condition of the sage grouse
throughout southwestern Montana.  In contrast, the 2003
Biological Evaluation shows that 87% of the sagebrush cover in
southwest Montana is on non-Forest Service land and the sagebrush
habitat that is within the BDNF is evenly distributed, including
the project area which is approximately 10% of the BDNF.  The
Forest Plan contemplates project areas in regard to the entire
forest.  Indeed, the Forest Service must ensure that habitat
across the BDNF is protected, including the Antelope Basin-Elk
Lake area, but Plaintiffs overstate the significance of the
sagebrush habitat in the contested area and overlook the results
of the Biological Evaluation.

Native Ecosystems' data concerning the leks is not
persuasive as both leks are not within the contested area, and

-12-

the closest of the two leks, the Fish Creek lek, which is three miles away, saw its male population increase from 14 in 2002 to 67 in 2004, something Plaintiffs do not contest but omit in their factual presentation.

One of Plaintiffs' principal assertions is the Forest Service has allowed the Antelope Basin-Elk Lake sagebrush habitat to succumb to the cumulative impacts of burning, spraying, and grazing.  The Forest Service has acknowledged these practices can be deleterious.[3]  However, there is no sign the area's current sagebrush habitat is unhealthy.

In an informative comparison between the Antelope Basin-Elk Lake sagebrush habitat and the conditions in the Cliff Lake Research Natural Area, a protected region-unexposed to burning, grazing or spraying-encompassed by the project area, the Forest Service shows it has effectively sustained viable sagebrush habitat within the project area.  The Cliff Lake area averaged 15% sagebrush coverage and 30% forb biomass.  Most of the eleven allotments averaged 15% sagebrush coverage with forb biomass averaging 20-30% (the measurement methods complied with the Connelly guidelines).  Plaintiffs failed to rebut these facts in their written briefs and before the Court at oral argument. These results indicate the Forest Service's management practices have sustained sagebrush habitat comparably to the region's

_____

[3] There is no indication in the briefs or the Administrative Record of future plans for the burning or spraying of sagebrush habitat in the Antelope Basin-Elk Lake area.

-13-

natural conditions.

The actual plan, Alternative B, is premised upon the Connelly guidelines for sustaining sage grouse population and sagebrush habitat. It reduces the total Animal Unit Months on the project area by 800 and limits forage utilizations in upland areas to 50% and riparian areas to 55%. The grazing season is also limited, cattle are not in the allotment pastures until after nesting season in mid-June. These practices demonstrate the Forest Service's resolve to maintain viable habitat.

Furthermore, Dr. Jack Connelly, who the Plaintiffs repeatedly refer to as an expert on sage grouse and sagebrush habitat, has expressly approved the Forest Service plan under the DN/FONSI. In a report following the DN/FONSI, "Conservation Assessment of Greater Sage Grouse and Sagebrush Habitats," Connelly examined sage grouse populations across a 770,000 square mile region. In this study he identified current sage grouse distributions with pre-settlement distributions. He noted the Gravelly landscape never contained a substantial sage grouse population and commented that the current project area is on the periphery of sage grouse concentrations in southwest Montana. When asked by the Forest Service for another specific evaluation of the AMPs, Connelly found the 2002 EA "reasonable and supported by available evidence" in its assessment of sage grouse habitat. He noted "minimal" impact by the project on the sage grouse. Connelly's conclusions suggest that the current paucity of sage grouse in the project area and within the BDNF is a reflection of

-14-

historical population distributions.

Not only do the facts and the scientific analysis support the Forest Service position, but recent Ninth Circuit case law does as well. In *Native Ecosystems Council*, plaintiffs filed suit to protect the goshawk, the designated MIS, and goshawk habitat from a disputed timber thinning project. 428 F.3d at 1235-36. The Circuit upheld this Court's finding of Forest Service compliance with NEPA and NFMA despite the absence of an EIS and the destruction of potential goshawk habitat. *Id.*

As here, the plaintiffs faulted the Forest Service for the absence of a viable population of the management indicator species. *Id.* at 1250. Plaintiffs also disputed the Forest Service's finding of no significant effect on goshawk habitat. *Id.* The court found that despite the diminishment of habitat by the thinning project, the Forest Service had complied with NFMA because it relied upon unflawed methodology to measure habitat and it used the "best available science" to ensure the viability of habitat under the "proxy on proxy" approach. *Id.* at 1251.

Another recent case is instructive as well. In *Ecology Center v. Austin*, the Ninth Circuit overturned this Court, finding there were NFMA and NEPA violations under a Forest Service decision to thin old-growth habitat. 430 F.3d 1057, 1060-61 (9th Cir. 2005). But in *Ecology Center*, the court based its NFMA ruling on a lack of proof of the results of the Forest Service action upon woodpecker and goshawk habitat and a dispute

-15-

among experts of the effects upon dependent species.  The court

found the decision arbitrary and capricious.  *Id.* at 1063-64.

Here, the Forest Service has relied upon methodology, the

Connelly Guidelines, recognized by both sides as the work of the

preeminent expert on the sage grouse and sagebrush habitat.

Native Ecosystems relies extensively on Connelly's work.  And

Connelly explicitly endorsed the Forest Service's choice of

Alternative B.  Additionally, unlike the thinning project in

*Ecology Center*, the project area has seen grazing for close to a

century and the sagebrush habitat still compares favorably to

protected areas within the region.  These factual comparisons

demonstrate how this decision complies with NFMA case law.

Consequently, the facts and pertinent case law attest to

Forest Service compliance with NFMA.  The Forest Service used

established methodology and scientific analysis to ensure the

selection of Alternative B would protect sagebrush habitat and

sage obligates.  The decision was not arbitrary or capricious.

### b.   Riparian Species and Habitat

Alternative B was specifically designed to improve riparian

habitat within the AMPs, further ensuring compliance with NFMA

and the Forest Plan.  Native Ecosystems reasonably recognizes the

destructive tendencies of cattle grazing upon riparian habitat,

but a total ban on grazing is not necessary and counter to NFMA's

multipurpose principle.  Plaintiffs also allege the decision does

not respond to significant cumulative impacts of grazing and

habitat management. However, Alternative B does addresses these

concerns and maintains riparian habitat viability.

Alternative B restores stream habitat by maintaining or improving all streams to a functioning condition. Currently there are 10 streams, located on five of the 11 allotments, that total 28 miles within the project area. Only 2.5 miles are non-functioning. During the EA the Forest Service assessed the streams in terms of mean bankfull width, pool spacing, pool frequency, and mean pool depth. To address stream flow problems, the plan limits livestock access, including complete bans on livestock access to Elk Springs Creek, Upper Narrows Creek, and portions of Elk Lake; restricts stream bank diminishment; and places a 55% limit on riparian forage utilization.

The Forest Service also adequately considered the effects of the decision upon riparian species. The EA found that these species, including wild trout and amphibians, would benefit by decreased livestock access and forage safeguards designed to improve the riparian habitat. Alternative B implements fencing measures and the use of water troughs to relieve livestock pressure on riparian areas.

The Forest Service extensively measured the impact of the plan upon the boreal toad.[4] The results found in expert Bryce Maxwell's "Report on Amphibian and Aquatic Reptile Inventories

---

[4]Defendants note the boreal toad is a sensitive species, but found no toads in the area over the course of three surveys in 2001. Defendants proceeded to analyze the project with respect to the toad because potential habitat exists, but is not a limiting factor.

Conducted on and around the Beaverhead-Deerlodge National
Forest," show that boreal toads are rare throughout the BDNF and
the project's habitat is suitable for toad viability.[5]

The decision also properly accounted for lake trout and the
arctic grayling. The Biological Evaluation showed that the lake
trout were not threatened and implementation would improve lake
trout viability. The arctic grayling is a MIS within the BDNF
and it has been threatened by low flows on some of the streams.
The plan accounts for this and keeps livestock away from Narrows
Creek, which is a spawning area. The other riparian measures are
expected to improve stream flows as well.

Alternative B adequately addresses riparian habitat
concerns within the project area. Indeed, riparian issues
stemming from the earlier lawsuit and the Riparian Amendment were
the impetus for the DN/FONSI. The Forest Service's efforts show
it has complied with NFMA and the NFMA case law discussed in the
preceding sage grouse analysis reinforces this conclusion.
Defendants have used proper methodology and analysis to ensure
the continued viability of riparian habitat.

        c.   **Conclusion**

In sum, the Forest Service's selection of Alternative B
complies with NFMA: it abides by the BDNF Forest Plan and also

_____

[5]Plaintiffs mistakenly miscited the EA in an effort to
depict the plight of the boreal toad. Under the proposed action
riparian habitat is restored, but Plaintiffs cited Alternative A,
the status quo choice, to argue that Defendants' actions would
continue the toad's trend toward listing.

                        -18-

complies with the substantive obligation to "provide for
diversity of plant and animal species."  Thus, because the FONSI
was not arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with the law, Defendants are entitled
to summary judgment regarding NFMA and Forest Plan claims.

**D.    The Decision Conforms to the National Environmental Policy
       Act.**

       **1.    NEPA Standards**

       The National Environmental Policy Act, 42 U.S.C. § 4321,
requires federal agencies such as the Forest Service to carefully
consider significant environmental impacts and provide relevant
information to the public.  *Blue Mountains Biodiversity Project
v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998), *cert. denied*,
*Malheur Lumber Co. v. Blue Mountains Biodiversity Project*, 527
U.S. 1 (Jun 14, 1999).  NEPA "imposes a procedural requirement
that an agency must contemplate the environmental impacts of its
actions."  *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149
(9th Cir. 1998).  "NEPA emphasizes the importance of coherent and
comprehensive up-front environmental analysis to ensure informed
decision making to the end that 'the agency will not act on
incomplete information, only to regret its decision after it is
too late to correct.'"  *Blue Mountains Biodiversity Project*, 161
F.3d at 1211 (quoting *Marsh v. Oregon Natural Resources Council*,
490 U.S. 360, 371 (1989)).

       NEPA is to be applied to "the fullest extent possible."
*Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986); 42 U.S.C. §

4332.  The legislative history behind this phrase provides: "[N]o agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance."  *Jones*, 792 F.2d at 826.

NEPA requires the Forest Service to prepare a detailed EIS for all "major federal actions affecting the quality of the human environment."  *Id.* (*citing* 42 U.S.C. § 4332(2)(c)).  An EIS must be prepared if "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor."  *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

Additionally, NEPA requires "where several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS."  *Neighbors of Cuddy Mountain v. United States Forest Service*, 137 F.3d 1372, 1378 (9th Cir. 1998) (quoting  *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990)).  "'Cumulative impact' is the impact on the environment which results from the incremental impact of the action when added to past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7.

If an agency chooses not to prepare an EIS, the court must determine whether the agency took a "hard look" at the environmental consequences.  *Blue Mountains Biodiversity Project*, 161 F.3d at 1211.  Generalizations about "possible effects" and "some risk" do not constitute a "hard look" without justification

explaining why more substantive information is not available. *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. When the agency's decision is "fully informed and well-considered," courts must defer to this decision. But if the agency fails to explain why potential effects are insignificant, the decision will be considered unreasonable. *Blue Mountains Biodiversity Project*, 161 F.3d at 1212.

An analysis of the Forest Service's decision reveals that it conforms to NEPA and applicable Ninth Circuit case law.

### 2.    The Proposed Agency Action does not Trigger an EIS.

Native Ecosystems contends that grazing has had a significant cumulative impact on the sage grouse, sagebrush habitat, and sage obligates and, therefore, an EIS is necessary. The Forest Service, however, shows it conducted a detailed analysis of the significant environmental effects before issuing its DN/FONSI, properly found no cumulative effects, and satisfied NEPA's "hard look" mandate.

While the sage grouse is an MIS and the population is declining in southwestern Montana-on and off Forest Service land-there are no indications of significant cumulative effect within the project area based upon sage grouse numbers alone. Native Ecosystems argues that because there is not an active sage grouse population within the project area, forest practices have

-21-

actually extirpated the species from the area.[6]  Reports from
over 30 years ago show a profound lack of sage grouse within the
project area and Connelly's substantial research casts doubt on
whether the sage grouse have ever populated the project area in
significant numbers.  It is hard to translate these numbers into
a finding of cumulative effect based on Forest Service practices.

Both parties apply many of the same arguments debated under
the NFMA analysis to NEPA.  The leks are cited for population
trends, but as discussed, they are not within the project area
and the trends associated with the two leks are generally
inconclusive.  Arguably the recent spike in grouse at the Fish
Creek Lek supports the Forest Service position.  In any case,
they do not support Native Ecosystems' argument regarding
cumulative effect.

Plaintiffs also argue that Forest Service burning, spraying
and grazing practices have cumulatively contributed to the
decline of the sage grouse through the elimination of suitable
habitat. There is no doubt the elimination of sagebrush impacts
sage grouse populations; however, the Forest Service's
uncontested habitat comparison between the Cliff Lake area and
the AMPs is an indicator of healthy sagebrush habitat within the
Antelope Basin-Elk Lake area.  Native Ecosystems does not address
this comparison.  This comparison shows there has not been a

---

[6] Plaintiffs and Defendants agree that sage grouse have not
been found within the project area for at least fifteen years.

significant cumulative effect on sagebrush habitat.

Connelly's population study provides an interesting perspective to apply to the determination of a baseline in the cumulative effects analysis. Plaintiffs suggest the cumulative effects argument could conceivably be baselined off of a pre-grazing status, approximately a century ago, but they provide no evidence of a sage grouse population within the project area from that time period. Connelly's finding cuts right to the heart of the issue-there is a good chance there never has been a substantial population of sage grouse in the AntelopeBasin-Elk Lake area.

Following Connelly's baseline, which is part of the Administrative Record and appears reasonable based on his scientific pedigree, which Native Ecosystems has acknowledged, the cumulative effects argument is eviscerated. Native Ecosystems may cite the general decline of sage grouse in southwestern Montana but fails to suggest a baseline population in the contested area based on facts that would lend credence to its assertions of Forest Service misconduct.

While there were problems within the riparian areas that prompted the Riparian Amendment and the selection of Alternative B, these past problems have been meticulously studied and accounted for in the DN/FONSI. Riparian issues should not prompt an EIS as the Forest Service's solution is tailored to this issue and takes appropriate measures to reverse past degradations.

The Forest Service has also properly determined there were
no "substantial questions" concerning "significant" effects on
the human environment before making its DN/FONSI.  The Forest
Service examined "significant" under "context" and "intensity"
and provided satisfactory analysis of the factors therein.

Nonetheless, Native Ecosystems find these results
controversial and suggests there is a battle of the experts in
this regard.  *Native Ecosystems* provides guidance here.  There,
the court disregarded a battle of the experts, where the same
expert, Dr. Sara Jane Johnson, provided input on the goshawk.
*Native Ecosystems*, 428 F.3d at 1243-44.  The court found the
Forest Service's DN/FONSI was not arbitrary and capricious based
upon its finding of no significant impact.  The court noted that
plaintiffs' characterization of the impacts of the thinning
project as "highly uncertain or controversial" were inadequate
given the Forest Service's considerable scientific analysis.  *Id.*
It further noted that Johnson's interpretations did not meet the
high level of controversy needed under Ninth Circuit case law.
*Id.*

The *Native Ecosystems* analysis is directly applicable here
where the Forest Service expended significant effort to follow
the guidance of a mutually recognized expert, Connelly, in its
habitat and species analysis.  It also conducted extensive
analysis of the riparian habitat to ensure compliance there.
Native Ecosystems' efforts here to create an experts crisis are

even less controversial than in *Native Ecosystems*, where here in effect, they are contesting one of their own experts, who they repeatedly laud as responsible for the "best science currently available."

The Forest Service made a "fully informed and well-considered" decision in compliance with NEPA. The Forest Service thoroughly analyzed the implications of its proposals and then made an appropriate selection through its DN/FONSI. This is particularly true where the subject of the controversy, livestock grazing, has existed for years within this region and its effects are predominately a known quantity that can be prevented through prescribed measures. Furthermore, scientific analysis shows the sagebrush habitat in the area is comparable to the natural habitat in a nearby protected area. Sage grouse population analysis suggests the population within the Antelope Basin-Elk Lake area is in line with historic populations. The Riparian Amendment, EA, and Biological Evaluation all addressed riparian concerns and indeed, were driving factors in the protective measures in the selection of Alternative B.

Accordingly, the Forest Service acted pursuant to NEPA and gave the requisite "hard look" analysis in its decision not to conduct an EIS. Defendants did not act in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

-25-

**E.    The Intervenor's Motion for Failure to Exhaust Remedies
Under the APA is well taken.**

Native Ecosystems is barred from pursuing claims that are

not properly before the Court.  Intervenors maintain certain

points should be dismissed or barred under exhaustion principles.

Following this precept, this Court does not have jurisdiction

over a party's claim where the party failed to properly exhaust

the issue through an administrative appeal  before the

appropriate agency. *See*, *e.g.*, *McKart v. U.S.*, 395 U.S. 185, 193

(1969); 5 U.S.C. § 704.  Notably, Native Ecosystems did not

respond to this issue in its written briefs and was unprepared to

discuss it during oral argument.

Specifically, Intervenors allege Native Ecosystems did not

properly exhaust the administrative appeals process pertaining to

the northern goshawk, the flammulated owl, the grayling, lake

trout, and the boreal toad.  Plaintiffs listed these species in

the Complaint and has argued points of its NFMA and NEPA claims

based upon treatment of these species.  In the Complaint, Native

Ecosystems also stated the Court had jurisdiction pursuant to the

Clean Water Act, but then  failed to make a claim asserting Clean

Water Act violations.

Consequently, any aspect of Plaintiffs' claims relating to

the northern goshawk, the flammulated owl, the grayling, lake

trout, and the boreal toad are not properly before the Court and

will not be considered.  Nor does the Court have proper

jurisdiction pursuant to the Clean Water Act and it will not

consider a claim alleged therein.

### IV. Conclusion

Accordingly, IT IS HEREBY ORDERED that Defendants' motion for summary judgment (dkt #21) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment (dkt #26) is DENIED.

IT IS FURTHER ORDERED that Intervenor's motion for summary judgment is GRANTED.

The Clerk of Court is directed to enter Judgment in favor of the Defendants and Intervenors.


Dated this 29th day of August, 2006

_____
Donald W. Molloy, Chief Judge
United States District Court